UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN DALTON, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                              Defendants. | Case No.:  21-CV-2143 W (WVG)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [DOC. 4]** |

Pending before the Court is Defendant San Diego County's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs oppose. The Court decides the matters on the papers submitted and without oral argument. See Civ. L.R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss [Doc. 4].

I.   **BACKGROUND**

Plaintiffs Steven Dalton and Tina Pizzo live together as domestic partners in a long term, committed relationship. (*Compl.* [Doc. 1] ¶ 5.[1]) At the time of the underlying

---

[1] Generally, this Court's orders refer to parties by their last names. However, where parties and/or witnesses share the same last name, this order will refer to first names.

incident, the couple had four children ages 9, 11, 14 and 16.  (*Id.*¶¶ 9, 16.)  The oldest, Octavia, is Steven's daughter and Pizzo's stepdaughter.  (*Id.* ¶ 9.)  Octavia is severely disabled, and there is a long history of police responses, juvenile court proceedings and psychiatric interventions.  (*Id.*)  More than once, Octavia has threatened her father, Pizzo and her siblings with violence, including assaults with knives.  (*Id.* ¶ 10.)

On April 10, 2021, Octavia asked Pizzo if she could play on her tablet.  (*Compl.* ¶ 11.)  When Pizzo denied her request, Octavia picked up a knife and threatened to murder Pizzo.  (*Id.*)  Steven was in the bathroom and heard the threat.  (*Id.* ¶ 12.)  He immediately rushed to the kitchen, where Pizzo had already disarmed Octavia, but Octavia had trapped Pizzo in a corner pushing and smacking her.  (*Id.*)

Steven placed Octavia in a bear-hug type hold and carried her over to the front door so she could go for a walk.  (*Compl.* ¶ 12.)  In response, Octavia dropped to the ground in front of the front door, grabbed an electrical cord attached to a fan and put it around her neck.  (*Id.* ¶ 13.)  Steven and Pizzo then used a 24/7 crisis support app on their iPhone to call for PERT support, as they have done many times in the past.  (*Id.*)  Octavia then left yelling that she was going to run away and kill herself.  (*Id.*)

When a deputy sheriff arrived, Steven and Pizzo explained what happened.  (*Compl.* ¶ 14.)  A report was made for the crises and another report was made for a runaway.  (*Id.*)  Deputies then searched for Octavia, but after approximately an hour called to say they had not found her.  (*Id.*)

After receiving the call from the deputies, Pizzo left the house to search for Octavia and found her within minutes.  (*Compl.* ¶ 14.)  Pizzo then called the Sheriff's Department to notify them that Octavia was located and at the home.  (*Id.* ¶ 15.)  A different deputy, Deputy Doe 1, was dispatched to the house.  (*Id.*)  While the deputy talked to Octavia outside, Pizzo went inside to let Steven know what was going on and check on the other kids.  (*Id.*)  Deputy Doe 1 then talked to Pizzo, who told the deputy about Octavia pushing and hitting her and Steven grabbing Octavia in a bear hug.  (*Id.*)  The deputy then asked to speak with Steven.  (*Id.*)

Steven asked Deputy Doe 1 if he had ever been to the residence before. (*Compl.* ¶ 16.) When the deputy stated he had not, Steven asked him to call somebody who had and then Steven would come back out to talk. (*Id.*) As Steven turned to go back inside, the deputy grabbed him by the arm and handcuffed him. (*Id.*) Before leaving with Steven in custody, Deputy Doe 1 said that if he had to come back out "someone else is going to jail." (*Id.*)

Soon after the deputy left with Steven, Octavia began digging her nails into Pizzo's arm and then went outside, grabbed a stick, and began hitting things, including Pizzo. (*Compl.* ¶ 17.) Pizzo again activated the crisis alert app and Deputy Doe 1 was dispatched to the house. (*Id.*) As the deputy arrived, Steven called from jail and Pizzo answered the telephone, which aggravated Deputy Doe 1. (*Id.*) Apparently feeling he was being ignored, the deputy began to remove his handcuffs from his belt, leading Pizzo to believe she was being detained. (*Id.*) At that moment, Brooke, the 14-year old daughter, showed the deputy a video of Octavia's behavior, at which point he turned from Pizzo, walked over to Octavia and had his partner take Octavia to the patrol car. (*Id.* ¶ 18.) Deputy Doe 1 then told Pizzo they were taking Octavia to the hospital. (*Id.*)

Steven was booked for child cruelty and resisting arrest and his bond was set at $100,000. (*Compl.* ¶ 19.) Steven was released after paying a bail bondsman $10,000, on credit terms. (*Id.*) The District Attorney did not file criminal charges and Steven received a "detention only" certificate in the mail. (*Id.*)

On December 29, 2021, Plaintiffs filed this lawsuit against the County and Does 1–5. (*See Compl.*) The Complaint contains five causes of action: (1) violation of 42 U.S.C. § 1983 based on unreasonable seizure; (2) violation of 42 U.S.C. § 1983 based on state-created danger; (3) negligence; (4) false arrest; and (5) violation of Civil Code § 52.1(b). The County now moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007). But a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. Papasan v. Allain, 478 U.S. 265, 286 (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

Complaints must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to rise above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

## III. DISCUSSION

### A. 42 U.S.C. § 1983 based on unreasonable seizure

Plaintiffs' first cause of action under 42 U.S.C. § 1983 is based on Steven's arrest and Pizzo's alleged detention. The County challenges this cause of action on several grounds.

First, the County argues Steven's arrest did not violate the Fourth Amendment. (*Cnty MTD P&A* [Doc. 4-1] 4:9–5:7.) The Complaint alleges, and the County concedes,

that Steven was arrested for "child cruelty" and "resisting arrest." (*Id.* 4:10.) There are no facts alleged in the Complaint remotely suggesting Deputy Doe 1 had probable cause to arrest Steven for child cruelty. The Complaint alleges Pizzo informed the deputy that "Octavia had her in a corner pushing and hitting her when Mr. DALTON bear-hugged her to get her off." (*Compl.* ¶ 15.) These allegations do not establish probable cause for child cruelty.

Similarly, there are no facts suggesting probable cause for resisting arrest. The Complaint alleges the Deputy Doe 1 asked to talk to Steven, who complied and came outside. (*Compl.* ¶ 16.) Steven then asked the deputy if he had ever been to the residence and when the deputy stated he had not, Steven asked that he call somebody who had and then turned to go back inside. (*Id.*) At that point, Deputy Doe 1 "grabbed [Steven] by the arm and put him in handcuffs, thereby arresting him…." (*Id.*) There are no allegations suggesting the deputy ordered Steven to stop so he could interview Steven and thus no inference Steven was "willfully resist[ing], delay[ing], or obstruct[ing]" the deputy's discharge of his duties. Cal. Penal Code § 148(a)(1). Assuming the truth of the factual allegations and reading all inferences in favor of Plaintiffs, the Court finds Deputy Doe 1 did not have probable cause to arrest Steven for resisting arrest.

Next, the County argues the Complaint fails to plead facts showing that Pizzo was unlawfully detained. (*Cnty MTD P&A* 6:7–20.) According to the County, "[t]o the extent that Pizzo is alleging she was detained for mere seconds when Doe 1 allegedly went to grab his handcuffs, such a *de minimis* action does invoke constitutional protections." (*Id.* 7:9–11.) In support of this argument, the County relies on <u>United States v. Enslin</u>, 327 F.3d 788 (9th Cir. 2003).

In <u>Enslin</u>, marshals were given permission to search a home for a fugitive. As the marshals entered a back bedroom, another individual, Bobby Der Enslin, was in bed with his hands concealed under the covers, having just woken up from sleep. Concerned for their safety, the marshals ordered Enslin to show his hands as they searched the room for the fugitive. "When Enslin put his hands in the air and began to sit up, his movement

shifted the covers and the marshals could see a gun in the bed next to him." Id. at 791. Enslin, who was on parole, was arrested. In the subsequent criminal case, Enslin filed a motion to suppress the firearm, which was denied.

Enslin appealed and argued he was seized without reasonable suspicion when the marshals ordered him to show his hands as they entered the bedroom. Id. at 795. The government argued "the marshals' order to Enslin to show his hands did not constitute a seizure pursuant to the Fourth Amendment." Id. Although the Ninth Circuit ultimately found the marshal's conduct was reasonable, it rejected the government's argument that there was no seizure. The court explained,

> "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." [United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).] The appropriate inquiry is whether the marshals' order "in some way restrain[ed]" Enslin's liberty such that a reasonable person under the circumstances would not have felt free to disregard the order. [United States v. Chan–Jimenez, 125 F.3d 1324, 1326 (9th Cir.1997).] Even if the official interference with an individual's liberty is brief, provided that it is some sort of "meaningful interference … with an individual's freedom of movement," it constitutes a seizure. [United States v. Jacobsen, 466 U.S. 109, 113 n. 5 (1984) (stating that '"the 'seizure' of a person within the meaning of the Fourth Amendment [is] meaningful interference, however brief, with an individual's freedom of movement"); see also United States v. Bailey, 628 F.2d 938, 940 (6th Cir.1980) ('"the fourth amendment does not overlook de minimis intrusions.").]

Id. Applying these principles, the Ninth Circuit found the marshals' show-hands order was a "meaningful interference" with Enslin's freedom. According to the court,

> [Enslin] had his hands covered and two armed marshals ordered him to reveal his hands. A reasonable person in Enslin's situation would not have felt free to ignore the request of the marshals, who likely had their hands on their weapons when they gave the order. [See Chan–Jimenez, 125 F.3d at 1326 (considering fact that officer had his hand on his weapon as an indication that a reasonable person in the defendant's circumstances would not have felt free to leave).] Therefore, the marshals' order to Enslin to show his hands constituted a seizure within the meaning of the Fourth Amendment.

Id.

Here, the Complaint alleges that after Deputy Doe 1 arrested Steven and was leaving the house, he told Pizzo that "if he has to come back out 'someone is going to jail.'" (*Compl.* ¶ 16.) A short time later, Pizzo activated the crises alert app and the deputy was dispatched back to the house. (*Id.* ¶ 17.) The Complaint then alleges that as Deputy Doe 1 arrived,

> [Steven] called from the jail. Ms. PIZZO answered the telephone, but this aggravated Deputy DOE 1, who, apparently feeling ignored, began to remove his handcuffs from his belt. Ms. PIZZO reasonably felt she was being detained at this point due to the show of force (i.e., handcuffs being retrieved). [¶] As the handcuffs were coming out, Brooke ([Steven's] then-14 year old daughter) showed Deputy DOE 1 a video of Octavia's behavior, at which point Deputy DOE 1 turned from Ms. PIZZO, walked over to Octavia and had his partner (DOE 2) take Octavia to his patrol vehicle.

(*Id.* ¶¶ 17, 18.)

Whether the above allegations are sufficient to establish Pizzo was detained is a close call. However, reading all inferences in favor of Plaintiffs, the Court finds (1) Deputy Doe 1's threat that if he returned to the house someone was "going to jail," combined with (2) the deputy's *removal* of his handcuffs as he approached Pizzo, and (3) Brooke's reaction, which suggests she showed the deputy the video of Octavia to prevent Pizzo's arrest, all support Pizzo's belief that she was not free to leave and, therefore, detained. Accordingly, the Complaint adequately pleads Pizzo was detained.[2]

### B.  42 U.S.C. § 1983 based on state created danger

In the second cause of action, Pizzo asserts a cause of action for violation of section 1983 under the "state-created danger" doctrine. The doctrine is an exception to

---

[2] Because the Complaint's allegations sufficiently plead Deputy Doe 1 lacked probable cause to arrest Steven and Pizzo reasonably believed she was detained, the Court need not address whether the Complaint also alleges the deputy had reasonable suspicion to detain Steven.

the general rule "'that a state is not liable for its omissions' and the Due Process Claus does not 'impose a duty on the state to protect individuals from third parties.'"  See Martinez v. City of Clovis, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000) and Morgan v. Gonzales, 495 F.3d 1084, 1093 (9th Cir. 2007)).  Under the exception, a state violates the Due Process Clause where its action "'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced."  Kennedy v. City of Ridgefield, 439 F.3d 1055 at 1061 (9th Cir. 2006) (citing DeShaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 197, 201 (1989) and quoting Wood v. Ostrander, 879 F.2d 583, 589–90 (9th Cir.1989) (bracket asserted by Kennedy).

To state a claim under the state-created danger doctrine, a plaintiff must plead facts supporting three elements: (1) the officers' affirmative actions created or exposed plaintiff to an actual, particularized danger that she would not otherwise have faced; (2) the injury suffered was foreseeable; and (3) the officers were deliberately indifferent to the known danger.  Martinez, 943 F.3d at 1271.  With regard to the first element, "whether the danger already existed is not dispositive because, 'by its very nature, the doctrine only applies in situations in which the plaintiff was directly harmed *by a third party*—a danger that, in every case, could be said to have 'already existed.'"  Id. (quoting Henry A. v. Willden, 678 F.3d 991, 1002 (9th Cir. 2012) (emphasis in original)).  Instead, the relevant question "is whether 'state action creates or exposes an individual to danger which he or she would not have otherwise faced.'"  Id. at 1271–72 (quoting Kennedy, 439 F.3d at 1061).  Here, the County argues Pizzo has failed to state facts supporting any of the elements for a state-created danger cause of action, and has adequately failed to plead damages.

The County contends the Complaint fails to allege that any affirmative act placed Pizzo in danger.  (*Cnty MTD P&A* 9:6–10:5.)  The County is wrong.  The Complaint alleges Deputy Doe 1's act of arresting Steven without probable cause exposed Pizzo to

the danger posed by Octavia. Specifically, the Complaint alleges that by unlawfully arresting Steven, the Deputy "departed, leaving Octavia behind and taking away the one person (Mr. DALTON) who could protect Ms. PIZZO and the other three minor children (then ages 9, 11 and 14) from Octavia." (*Compl.* ¶ 16.) In short, by unlawfully arresting Steven, Deputy Doe 1 exposed Pizzo to a danger—dealing with a violent Octavia without Steven's protection—she would not have otherwise faced that evening.

Next, the County argues the Complaint fails to allege "facts to show that leaving Pizzo alone with O.D. left Pizzo in obvious danger" because "Plaintiffs have not plead facts indicating that O.D. was displaying active dangerous behaviors when Doe 1 arrested Dalton." (*Cnty MTD P&A* 10:6–16.) This argument ignores that the reason deputies were dispatched to Plaintiffs' residence was "Octavia pick[ing] up a knife and threaten[ing] to murder Ms. PIZZO." (*Compl.* ¶ 11.) It is reasonable to infer Deputy Doe 1 was aware of the threat based on the allegations in the Complaint that (1) Plaintiffs "explained what happened" to the first deputy arriving on scene who then prepared a report (*id.* ¶ 14) and (2) when Deputy Doe 1 arrived, he also interviewed Pizzo about the incident (*id.* ¶ 15). Based on these allegations, the County's contention that Plaintiffs failed to allege facts showing that leaving Pizzo alone with Octavia posed an obvious danger lacks merit.

The County also argues that "[b]ecause the danger was not obvious, Doe 1 could not have acted with deliberate indifference towards Pizzo's safety." (*Cnty MTD P&A* 10:17–11:8.) For the reasons stated in the previous paragraph this argument lacks merit. Moreover, in addition to informing Deputy Doe 1 about Octavia's conduct, the Complaint alleges that Pizzo informed him that Steven—the person Deputy Doe 1 unlawfully arrested and took from the scene—protected Pizzo when she was getting attacked by Octavia: "Ms. PIZZO told [Deputy DOE 1] that Octavia had her in a corner pushing and hitting her when Mr. DALTON bear-hugged her to get her off." (*Compl.* ¶ 15.) The allegations sufficiently allege Deputy Doe 1 acted with deliberate indifference toward Pizzo's safety.

1    Finally, the County contends Pizzo's cause of action is defective because the only
2 damages alleged are emotional distress. (*Cnty MTD P&A* 10:9–19.)  In support of this
3 argument, the County cites an unpublished decision, J.P. by & through Villanueva v. Cty.
4 of Alameda, 803 F. App'x 106 (9th Cir. 2020).  There, the Ninth Circuit held the plaintiff
5 could not sustain a claim under the state-created-danger doctrine where the plaintiff
6 alleged the county's "failure to remove him from his foster home caused him emotional
7 distress" for "exposing him to potential harm from drugs." Id. at 108.  The court
8 reasoned that "[o]ur cases have not recognized a Fourteenth Amendment violation under
9 these two exceptions for emotional distress alone, or for direct harm to another party.
10 [Citations omitted.]" Id.

11    In response, Plaintiffs argue Pizzo's allegation that she suffered emotional distress
12 is sufficient under Henry A., 678 F.3d 991. (*Opp'n* 17:1–19.)  Henry A. was brought by
13 a group of children removed from their homes and placed in foster care.  They sued the
14 County alleging liability under the state-created-danger doctrine for placing them with
15 foster parents who were unfit to care for them and posed an imminent risk of harm to
16 plaintiffs' safety. Id., 678 F.3d at 1102.  Some of the plaintiffs sustained serious injuries
17 such as organ failure from the lack of adequate medical care and an impacted colon that
18 required life-threatening surgery. Id. at 997.  Other plaintiffs' injuries were arguably not
19 quite as severe and were described more generally as "physical abuse" sustained in the
20 foster home. Id.

21    The court disagrees with Pizzo's contention that Henry A. stands for the
22 proposition that emotional distress damages are sufficient to sustain a claim under the
23 state-created-danger doctrine.  However, despite Pizzo's argument, the Complaint does
24 not simply allege Pizzo suffered emotional distress.  Instead, it alleges that after Deputy
25 Doe 1 left with Steven, Octavia started digging her nails into Pizzo's arm and hit her with
26 a stick. (Compl. ¶ 17.)  In other words, like Henry A., Plaintiffs allege Pizzo was
27 physically abused by Octavia.  Accordingly, the Court finds the County's argument that
28 the cause of action is based solely on allegations of emotional distress lacks merit.

For all these reasons, the Court finds the Complaint sufficiently alleges a section 1983 violation based on the state-created danger doctrine.

### C.  Bane Act, Cal. Civil Code § 52.1.

The Complaint alleges a violation of the California Civil Code § 52.1, the Bane Act.  The statute permits a party to bring an action against any person who:

> interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of th[e] state…

Cal. Civ. Code § 52.1(b). "'The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.'" Cornell v. City & County of San Francisco, 17 Cal.App.5th 766, 792 (2017) (quoting (Simmons v. Superior Court, 7 Cal.App.5th 1113, 1125 (2016)).

The County argues the Complaint fails to support a Bane Act violation because "Plaintiffs do not allege facts to show that any County defendant interfered with [Steven's] civil rights by threats, intimidation or coercion outside of those inherent in any arrest...." (*Cnty MTD P&A* 13:12–15.)  The County also argues the claim should be dismissed because contrary to Plaintiffs' contention in the opposition, the Complaint does not assert a claim for violation of their right to family association and right to take care of their child.

As an initial matter, the Court agrees with the County's contention that the Complaint fails to allege a claim for violation of Plaintiffs' right to family association and right to take care of their child.  Nowhere in the Complaint do Plaintiffs set forth that legal theory.  However, for the following reasons, the Court finds the Complaint sufficiently pleads a Bane Act violation based on the unlawful arrest and detention.

The County argues the Complaint fails to plead a Bane Act violation because "Plaintiffs do not allege facts to show that any County defendant interfered with [Steven's] civil rights by threats intimidation or coercion outside of those inherent in any arrest…." (*Cnty MTD P&A* 13:12–14.)  In support of this argument, the County relies on Quiroz v. City of Los Angeles, 2019 WL 8013117, at *13 (C.D. Cal. 2019), which held that in "the context of [a] false arrest claim, a plaintiff alleging a Bane Act violation must show threats or coercion beyond the coercion inherent in a detention or search." (*Id.* 13:6–8.)  The County also points out that Quiroz's holding is based on the Ninth Circuit's decision in Lyall v. City of Los Angeles, 807 F.3d 1178, 1196 (9th Cir. 2015). (*Id.*)  The County's reliance on these cases is misplaced based on subsequent California and Ninth Circuit case law.

Lyall, like Quiroz, did not independently evaluate whether the Bane Act requires a plaintiff to "allege threats or coercion beyond the coercion inherent in the detention or search…." Id., 807 F.3d at 1196.  Instead, Lyall followed a line of California cases beginning with Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012), interpreting the statute.[3]  The alleged Bane Act violation in Shoyoye, however, was particularly weak, stemming from plaintiff's over-detention for approximately 16 days because of an unintentional clerical error.  In fact, "a close reading" of the case reveals that while "originally [the plaintiff] alleged a constitutionally unreasonable seizure… as the case proceeded there was never any dispute that the arrest was lawful.  In fact he conceded there was probable cause to arrest him." See Cornell v. City and County of San Francisco, 17 Cal. App.5th 766, 797 (2017) (discussing Shoyoye).  Accordingly, not long

---

[3] Lyall cited three California cases: Allen v. City of Sacramento, 234 Cal.App.4th 41 (2015), Quezada v. City of L.A., 222 Cal.App.4th 993 (2014) and Shoyoye v. Cnty. of L.A., 203 Cal.App.4th 947 (2012).  However, Allen and Quezada did not evaluate the Bane Act, but instead simply relied on Shoyoye's analysis of the statute.  See Allen, 234 Cal.App.4th at 68–69 ("Consistent with *Shoyoye*, we conclude a wrongful arrest or detention, without more, does not satisfy both elements of section 52.1."); Quezada, 222 Cal.App.4th at 1008 (citing Shoyoye as support for the statement that "[t]he coercion inherent in detention is insufficient to show a Bane Act violation.")

12

after <u>Shoyoye</u> was decided, district courts began interpreting the case narrowly to apply only to circumstances involving unintentional conduct.  See e.g., <u>D.V. v. City of Sunnyvale</u>, 65 F.Supp.3d 782, 787–89 (N.D. Cal. 2014) ("[s]ubsequent decisions, especially in this District, have largely limited *Shoyoye* to its first holding, that § 52.1 requires intentional interference with a constitutional right, and not merely negligent acts"); <u>Hutton v. City of Berkeley Police Department</u>, 2014 WL 4674295, *17 (N.D.Cal. 2014) (concluding that "the *Shoyoye* court's holding is dicta to the extent that it goes beyond the facts of that case, involving a Bane Act claim that is grounded in negligence rather than an intentional act."); <u>Soler v. County of San Diego</u>, 2015 WL 13828659, *3 (S.D.Cal. 2015) ("a number of federal district courts have since limited *Shoyoye's* holding and determined that it should not be read as requiring a separate showing of threats, intimidation, or coercion independent of that which is inherent in the unlawful seizure itself.  [Citations omitted.]").

In 2017, the California Court of Appeals in <u>Cornell</u> evaluated <u>Shoyoye</u> and also found the case should be read narrowly:

> we do not accept the premise that *Shoyoye* applies in unlawful arrest cases. Because read closely, Shoyoye's discussion of coercion 'independent from the coercion inherent in the wrongful detention itself' was aimed at separating tort liability from statutory liability in the specific contest of a jail overdetention following a lawful arrest—on a record where no legally viable claim of any constitutional violation was pleaded or proved….

<u>Cornell</u>, 17 Cal. App.5th at 799.  The court also explained that the Bane Act's language did not support <u>Shoyoye</u>'s added requirement of threats, intimidation or coercion independent from the constitutional violation:

> By its plain terms, Section 52.1 proscribes any "interfere[nce] with" or attempt "interfere[nce] with" protected rights carried out "by threat, intimidation or coercion."  Nothing in the text of the statute requires that the offending "threat, intimidation or coercion" be "independent" from the constitutional violation alleged.

Id. at 800, citing § 52.1(a). The court, therefore, held where "an unlawful arrest is properly pleaded and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure, not by whether the evidence shows something beyond the coercion 'inherent' in the wrongful detention." Id. 801–802. See also B.B. v. County of Los Angeles, 25 Cal. App. 5th 115, 130 (2018) (holding that Shoyoye's transactional independence requirement applies only to negligence claims) rev'd on other grounds in B.B. v. County of Los Angeles, 10 Cal. 5th 1 (2020).

In light of Cornell, in 2018, the Ninth Circuit again considered whether the Bane Act requires threats or coercion beyond that inherent in the detention or search. In Reese v. County of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018), the court concluded: "we see no 'convincing evidence that the state's supreme court likely would not follow' *Cornell*" and held that "the Bane Act does not require that the 'threat, intimidation, or coercion' element of the claim be transactionally independent from the alleged constitutional violation." Id. at 1043. See also Sandoval v. City of Sonoma, 912 F.3d 509, 520 (9th Cir. 2018) (stating Reese "substantially clarified the legal standard to be applied in a Bane Act claim[,]" which under Cornell evaluates whether the constitutional violation was committed "with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?")

This Court is both persuaded by those cases reading Shoyoye narrowly and compelled by Reese to follow Cornell. Thus, whether Plaintiffs have sufficiently alleged a Bane Act violation depends on whether the allegations indicate "the arresting officer had a specific intent to violate" Steven and/or Pizzo's constitutional rights. Cornell, 17 Cal. App.5th at 801–802.

As discussed above, when read in favor of Plaintiffs, the Complaint's allegations support the finding that Deputy Doe 1's arrest of Steven was not based on probable cause and the deputy's detention of Pizzo was not based on reasonable suspicion. Moreover, it is reasonable to infer from the allegations that Deputy Doe 1 acted out of spite, upset

1 when Steven turned his back on the deputy and when Pizzo answered a phone call as the
2 deputy approached her.  (*See Compl.* ¶¶ 16, 17.)  Accordingly, at this stage in the
3 litigation, the Court finds the allegations suffice to support a finding that Deputy Doe 1
4 intended to violate Plaintiffs' Fourth Amendment rights.

### D. Claim against the County.

The County argues that to the extent Plaintiffs are alleging direct liability against the County, the claim fail as a matter of law.  (*MTD P&A* 12:12–14.)  In their opposition, Plaintiffs argue they can bring claims against the County for respondeat superior liability under Government Code § 815.2.  (*Opp'n* 19:1–15.)  The County's reply does not dispute that liability exists under section 815.2, nor does the County argue that Plaintiffs do not allege liability based on respondeat superior.  Instead, the County argues because "this authority" (presumably meaning section 815.2) "is not included in the complaint… the County should be dismissed from the false arrest, Bane Act and negligence claims." (*Reply* [Doc. 9] 6:4–10.)

The Complaint's allegation indicate that the County's liability is based on the deputies' conduct, as well as the County's customs and policies.[4]  (*Compl.* ¶¶ 6, 7, 34, 38, 43 46.)  Contrary to the County's argument, there is no requirement that the Complaint specifically identify the legal authority supporting the claim for respondeat superior liability as long as Plaintiffs allege sufficient facts to put the County on notice of the claim. See Kirkpatrick v. Cnty of Washoe, 843 F.3d 784, 790 (9th Cir. 2016) (claim factually asserting constitutional rights violation not inadequate because it failed to specifically refer to the Fourth Amendment).  Accordingly, the Court finds the County's argument lacks merit.

---

[4] The County's motion does not challenge the Complaint allegation of liability based on its "customs, and policies…." (*Compl.* ¶ 43.)

### E. Claims against Does 2–5.

The County argues Does 2–5 should be dismissed because there are no allegations in the Complaint relating to them. In response, Plaintiffs concede there are no facts supporting the causes of action against Does 2–5, but argue dismissal would be premature because the extent of their involvement is not known. (*Opp'n* 19:16–20.) The lack of factual support is not a basis for avoiding dismissal. To the extent discovery reveals facts supporting causes of action against Does 2–5, Plaintiffs may move to amend to add defendants.

### IV. CONCLUSION AND ORDER

For the foregoing reasons, the Court **GRANTS** the County's motion to dismiss [Doc. 4] with respect to Does 2 through 5. The motion is **DENIED** on all other grounds.

**IT IS SO ORDERED**.

Dated: April 25, 2022

_____
Hon. Thomas J. Whelan
United States District Judge