# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

STEVEN DALTON, et al.,

                                    Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

                                    Defendants.

Case No.:  3:21-CV-2143 W (WVG)

**ORDER (1) GRANTING MOTION TO SEAL [DOC. 27], (2) GRANTING JOINT MOTION TO AUTHENTICATE DOCUMENTS [DOC. 40], AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' SUMMARY-JUDGMENT MOTION [DOC. 29]**

Pending before the Court is Defendants' motion for summary judgment and partial summary judgment. Defendants have also filed a motion to seal certain exhibits. Plaintiffs oppose the motion for summary judgment but not the motion to seal. Additionally, the parties have filed a joint motion to authenticate documents.

The Court decides the matter on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS** the motion to seal [Doc. 27], **GRANTS** the joint motion to authenticate documents [Doc. 40] and **GRANTS IN PART** and **DENIES IN PART** the summary-judgment motion [Doc. 29].

1

**I.    MOTIONS TO SEAL**

Defendants move to seal Exhibits A through N, filed in support of their summary-judgment motion.  (*See Defs' Mot. to Seal* [Doc. 27] 1:26–28.)  The basis for the motion is that the exhibits "are either marked as 'Confidential' under the protective order in this case, which requires the parties to request filing under seal, or implicate juvenile police and mental health records."  (*Id.*)

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n. 7 (1978)). Although access to judicial records is not absolute, there is a "narrow range" of documents that have traditionally been kept secret for policy reasons: "grand jury transcripts and warrant materials in the midst of a preindictment investigation." *Id.* (citing *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)). The importance of this narrow range is that "[u]nless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Id*. (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

"[T]he strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments." *Kamakana*, 447 F.3d at 1179. This is "because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Id*. (quoting *Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1294 (9th Cir. 1986)). "Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion." *Id.* (citing *Foltz*, 331 F.3d at 1136). This standard applies "even if the dispositive motion, or its attachments, were previously filed under seal or protective order." *Id.*

Here, Defendants' reliance on the fact that the exhibits were subject to a protective order is not a sufficient basis to seal the documents. *Kamakana*, 447 F.3d at 1179. To the extent the exhibits identify a minor and implicate her criminal and mental health history, the documents may be sealed. *See A.C. v. City of Santa Clara*, 2015 WL 4076364, *1 (N.D.Cal. 2015) (granting motion to seal medical records and juvenile court records based on finding that compelling confidentiality concerns outweigh the presumption of public access to court records); Cal. Welf. & Inst. Code § 827. The problem, however, is much of the information Defendants purportedly seek to keep confidential was identified in the parties' briefs and the Amended Complaint and, therefore, has already been disclosed. (*See, e.g. Pls' Opp'n* [Doc. 34] 1:7–2:7; *Defs' P&A* [Doc. 29-1] 1:5–3:1; *Am. Compl.* [Doc. 18] ¶¶ 9–13.)  Additionally, the information revealed by the parties is important to the issues addressed in this order and thus necessary in understanding the Court's reasoning. Thus, where the parties' filings have already disclosed information relating to a minor's health and juvenile records that is important to the analysis, the information is no longer confidential and is referred to in this order.

Nevertheless, in reviewing the exhibits, the Court has also come across information pertaining to the minor's health or juvenile records that has not been disclosed. For this reason, the Court will grant Defendants' motion to seal the exhibits.

## II.   FACTUAL BACKGROUND

Plaintiffs Steven Dalton and Tina Pizzo are domestic partners.  (*Am. Compl.* ¶ 5.) O.D. is Dalton's biological daughter and was 16 years of age at the time of the underlying events.  (*Id.* ¶ 9.)  Although Pizzo is not O.D.'s biological mother, she has been in O.D.'s life since O.D. was a baby and considers herself O.D's mother. (*Defs' Ex. L – Sealed* [Doc. 28] at 16:1-5.) She is also O.D.'s primary caregiver, in charge of coordinating paperwork and appointments for O.D., who suffers from depression and mood disorder and has a history of hurting herself and others. (*Id.* at 30:3–31:2; 45:5–7; 47:2–8; *Defs' Ex. A2 - Sealed* [Doc. 28] at 3–4.)

3

The family has a 24-hour crises application on their iPad that allows them to immediately contact telehealth support for O.D. (*Defs' Ex. D2 – Sealed* [Doc. 28] 2:24–3:1.) Deputies have been called to the residence on numerous occasions due to altercations between Pizzo and O.D. (*Defs' Ex. L – Sealed* at 25:3–12.)  Some of the calls have led to O.D. being placed on a medical hold under California Welfare & Institutions Code § 5150. (*Id.*)

### A.   Deputy Collins is dispatched to Plaintiffs' home based on a report that O.D. pulled a knife on Pizzo.

On April 10, 2021, at approximately 10:00 a.m., a telehealth provider called 911 on behalf of Pizzo to report that O.D. had "pulled a knife on her parents" and "run away." (*Defs' Ex. A2* at 1.)  While talking to the 911-dispatcher, the telehealth provider was also on a video call with Pizzo.  (*Id.*)  The telehealth provider reported that O.D. was 16, "pretty tall… possibly 5'8"," and was a "little on the heavier side."  (*Id.* at 1–2.)  She also reported O.D.'s history of depression, hurting her siblings and herself, and that she was refusing to take her medications.  (*Id.* at 3–4.)  The 911-operator asked if she was aware if there were "any weapons in the home beside the knife," to which the telehealth provider responded, "[n]ot that I'm aware of."  (*Id.* at 4.)

Defendant Deputy Collins was dispatched to Plaintiffs' residence to investigate the call. (*Defs' Ex. C1* [Doc. 28] at 62:6–18.)  As he drove to the scene, the 911 operator relayed the information provided by the telehealth provider.  (*Defs' Ex. B* [Doc. 28] at 1–3; *Defs' Ex. C* at 52:18–21.) After arriving, the Deputy immediately spoke to Pizzo, who asked if the Deputy had ever "been out here before?" (*Defs' Ex. D2 – Sealed* 2:4.) Though he had not, Deputy Collins stated that he knew other sheriffs had been dispatched to the residence before. (*Defs' Ex. C1* at 52:22–24; *Defs' Ex. D2 – Sealed* at 2:4–6.)

Pizzo then showed O.D.'s picture to Deputy Collins and said she had taken "off last night too, but we found her and brought her back." (*Defs' Ex. D2 – Sealed* at 2:16–21.) Pizzo then explained that when she got home from work at 7:00 a.m., O.D. seemed

4

bored and began "throwing things." (*Id.* at 3:5–12.) Eventually O.D. became upset because she was not allowed to use her tablet and "started throwing harder things, like a can of humus, a thing of sprinkles" and "then she pulled a knife on me." (*Id.* at 3:14–4:3.)  Pizzo stated,

> I was in the kitchen, I was making food, there was a knife right there. She grabbed it. She's all, you want me to stab you? And I'm all, stop. And so I go take the knife away.
>
> And then when I come back she's got my phone. And I'm all, give me my phone, you know. And then that's when she dug her nails into me, and then that's when her dad came out because he was in the bathroom and he heard all this going on. And he tried to tell her go for a walk. And she was like, you know, leave me the fuck alone, you know, whatever it was she was saying. And then she said she was going to run away and kill herself.
>
> And then she – that's where we're at. She took off.

(*Id.* at 4:3–18; *Am. Compl.* ¶¶ 11, 13.) Regarding the knife, Pizzo did not believe O.D. was "messing around" or "joking." (*Defs' Ex. D2 – Sealed.* at 5:9–18.) She said O.D. hits her and showed the Deputy a bruise on her arm, which was "a couple weeks old; but I mean usually her weapons of choice are her fingernails, I've got maybe a claw mark in my shoulder." (*Id.* at 5:19–22.)

Deputy Collins asked about O.D.'s statement that she wanted to hurt herself. (*Defs' Ex. D2 – Sealed* at 6:7–8.) Pizzo said in the past she talked about it and that "today" she "said she was going to go off and kill herself" and "she put an electric cord around her neck…." (*Id.* at 6:12–23; *Am. Compl.* ¶ 13.) At some point Pizzo said "there's a lot of history…." (*Defs' Ex. D2 – Sealed* at 7:22–23.)

Deputy Collins asked if Pizzo needed medical attention, to which she said, "no." (*Defs' Ex. D2 – Sealed* at 8:14–16.) Pizzo then stated O.D. was supposed to be on medication, but "refused her meds all week." (*Id.* at 8:17–21.)

Deputy Collins continued questioning Pizzo about where O.D. might have gone. Pizzo was unsure, but assured him that "once you guys find her she should be really nice

and calm and cooperative for you guys. She usually is." (*Defs' Ex. D2 – Sealed* at 9:19–12:1.) Deputy Collins then left to search for O.D.  (*Id.* at 13:19–22.)

**B.**   **Pizzo finds O.D. and Deputy Collins returns to Plaintiffs' home to continue his investigation.**

After unsuccessfully searching for O.D., Deputy Collins called Pizzo for updates. (*Def's Ex. C1 – Sealed* at 79:10–80:9; 107:3–21.) Pizzo informed him that she found O.D. and brought her home. (*Id.*) Deputy Collins then returned to finish his investigation.

When Deputy Collins arrived, Pizzo and O.D. were talking calmly in the garage. (*Defs' Ex. E1 – Sealed* [Doc. 28] at 0:00:15–0:00:25.[1]) As Pizzo had predicted, when the Deputy began talking to O.D., she was "nice and calm and cooperative." (*Id.* at 0:00:26–0:00:56.) She even joked with the Deputy about seeing other deputies presumably out looking for her. (*Id.*; *Defs' Ex. E2 – Sealed* [Doc. 28] at 2:1–3:7.)

The Deputy then asked O.D. if she felt like "hurting yourself" or "other people." (*Defs' Ex. E2 – Sealed* at 3:8–9.) O.D. said "no" and asserted she was just out for a walk and trying to get a drink. (*Id.* at 3:8–17.) The Deputy asked, "[w]hat's the deal with the whole knife thing? Were you just playing around?" (*Id.* at 3:18–22.) O.D. claimed she picked up the knife "because it was on the counter and was dirty" so she was "trying to put it in the sink." (*Id.*) O.D.'s responses were unemotional and very matter of fact. (*Defs' Ex. E1 – Sealed* at 0:00:56–0:01:13.)

Deputy Collins asked about O.D.'s plans for the rest of the day, and she appeared to become a little upset claiming she had no plans "because I can't do anything the rest of the day. All I do is sit down anyways because my mom and dad don't want me doing anything." (*Defs' Ex. E1 – Sealed* at 01:20–01:28; *Defs' Ex. E2 – Sealed* at 3:24–4:3.)

---

[1] Defendants' Ex. E1 is video from Deputy Collins' body camera.

Deputy Collins told O.D. that "you just can't wander off without telling mom where you're going," and O.D. quickly interjected: "they told me to go for a walk, so I went that way" and signaled that she walked to her right. (*Defs' Ex. E2 – Sealed* at 4:5–8.) O.D. then admitted not telling her parents where she was going, and the Deputy said, "maybe next time just tell them; if they're telling you to go for a walk, tell them exactly where you're going." (*Id.* at 4:9–14.) O.D. again quickly responded, "I told them I was going that way" and now signaled leaving in the opposite direction, i.e., toward her left. (*Id.* at 4:15.) During this interaction, O.D. was calm, friendly and her responses were quick and matter of fact. (*Defs' Ex. E1 – Sealed* at 0:01:29–0:01:39.)

Deputy Collins then cautioned O.D. to "pick a place is what I'm say[ing], like, Starbucks, Vons, parking lot, you know what I mean? Because that way we don't have to take you to the hospital and put you on the hold again and all that. You okay?" (*Defs' Ex. E2 – Sealed* at 4:16–20.) At that point O.D.'s demeanor changed, and she claimed she "walked away because my dad, he tried -- he was choking me and then dragged me out, and then after that he slapped me a couple times across the face." (*Id.* at 4:21–24.) As she described what happened O.D.'s voice quivered, and she began to tear up. (*Defs' Ex. E1 – Sealed* at 0:01:50–0:02:16.) The Deputy asked if she needed medical attention, and by the time O.D. responded "no," she seemed to have regained her composure. (*Id.* at 0:02:34–0:02:40; *Defs' Ex. E2 – Sealed* at 5:10–12.) After a few seconds, the Deputy again asked her "what happened" and O.D. said:

> I got mad, my dad came out because I was yelling. And then after that he told -- he was telling me to get out. He kicked me out of the house again, like he always does when he gets mad at me. And then when he -- he was telling me to get out, he went like this [i.e., motioning that Dalton placed her in a chokehold], and started dragging me. And then I told him, get away from me. And then he pushed me down on the ground and started smacking me across the face.

(*Defs' Ex. E2 – Sealed* at 5:14–23.) While explaining what happened, O.D. again appeared sad and at one point her voice quivered. (*Defs' Ex. E1 – Sealed* at 0:02:40–

7

0:03:07.) The Deputy immediately asked how Dalton hit her, and O.D. confirmed it was with an open hand "like three times" across the left side of her face. (*Defs' Ex. E2 – Sealed* at 5:24–6:10.) But her responses to the Deputy's follow-up questions were unemotional and matter of fact, and she again appeared calm and friendly as she tossed around a water bottle. (*Defs' Ex. E1 - Sealed* at 0:03:07–0:03:23.)

O.D. then confirmed that Dalton lived at the house and "was going to come walk and find me, but my mom did instead." (*Defs' Ex. E2 – Sealed* at 6:11–16.) She then volunteered that "[e]very time the police want to talk to [Dalton], he doesn't cooperate anyways" and argues with them. (*Id.*at 6:17–20.) The Deputy asked if he "hit you before" and O.D. said "yes" and claimed that "last time," after deputies left the house, Dalton "yanked my hair and dragged me outside" across the ground and "the CPS worker came over." (*Id.* at 6:20–7:11.) The Deputy asked if Dalton had "ever been arrested for this," and O.D. said that he had when she was younger. (*Id.* at 7:12–18.)

Deputy Collins used his cell phone to search for Dalton's arrest record. (*Defs' Ex. C1 – Sealed* at 86:2–97:1; *Defs' Ex. E1 – Sealed* at 0:04:30–0:06:17.) Meanwhile, O.D. continued, "[e]very time my dad like does something, he's like, I'm not afraid to go back to jail anyways." (*Defs' Ex. E2 - Sealed* at 7:17– 8:1.) She also said Dalton is "always angry and then starts hurting people. He mostly hurts me mostly. I'm the only one that gets hurt." (*Id.* at 8:1–8.) O.D.'s voice seemed to briefly quiver. (*Defs' Ex. E1 – Sealed* at 0:05:29–0:05:49.) The Deputy then showed O.D. his phone and asked "[i]s that your dad?" (*Defs' Ex. E2 – Sealed* at 8:15.) O.D., who now appeared affable again, said "[n]o. Steven Paul Dalton. If you see him, he can come out if he wants" and O.D. then laughed. (*Id.* at 8:16–18; *Defs' Ex. E1 – Sealed* at 0:06:06–0:06:16.) He then showed her another picture and she confirmed it was her father. (*Id.* at 8:19.)

At that point, O.D.'s younger sister walked into the garage. (*Defs' Ex. E1 – Sealed* at 0:06:30–0:6:36.) The Deputy asked O.D. if her younger sister saw anything and O.D. said "no." (*Defs' Ex. C2 - Sealed* at 8:22–23.) The Deputy then asked the younger sister if she saw "anything today as far as a fight?" and she responded that "when it first started,

8

I did see [O.D.] have our mom's phone -- [a]nd then I heard her yell -- I heard my mom yelling to like -- she was saying like, get your nails out of my arm." (*Defs' Ex. E2 – Sealed* at 9:5–13.) O.D. appeared defensive and interjected that "I took mom's phone because she took my tablet" and O.D. claimed that "I didn't have my nails in her arm though, I was like holding her because she wouldn't let go of me." (*Id.* at 9:14–16; *Defs' Ex. E1 – Sealed* at 0:06:45–0:07:02.) The Deputy asked if she saw anything else, and the younger sister said "no" and quickly walked back into the house. (*Defs' Ex. E2 - Sealed* at 9:17–19; *Defs' Ex. E1 – Sealed* at 0:07:00–0:07:06.)

Although the Deputy's body-camera video appeared to show O.D.'s demeanor wavered between being calm and affable most of the time, and sad and frightful for short periods, the Deputy testified that he believed O.D. was generally frightful and sad, and he did not believe she was lying. (*Defs' Ex. C1 – Sealed* at 81:7–19; *Defs' Ex. C2 – Sealed* at 153:5–12, 154:1–6.) Deputy Collins also noticed redness on her face and dark marks on her neck, though he later admitted not being sure if they were from her interactions with Dalton or simply the tone of her skin. (*Defs' Ex. C1 - Sealed* at 50:8–12, 52:9–14, 116:3–6; *Defs' Ex. C2 - Sealed* at 152:13–23; *Defs' Ex. E2 – Sealed* at 5:9–12.)

After speaking with O.D., Deputy Collins briefly talked to Pizzo again. He asked "what else happened when [O.D.] was leaving." (*Defs' Ex. E2 - Sealed* at 10:8–9.) She said "[w]e were just telling her that she needed to cool off" and go outside and O.D. said she was "going to run away and kill myself." (*Id.* at 10:12–22.) The Deputy asked if there was a "physical altercation," to which Pizzo responded, "[y]eah, with me and her." (*Id.* at 10:23–25.) The Deputy asked, "[h]ow about dad?" and Pizzo said "[n]o, just other than trying to corral her to go out front, that's it. Well, that and then when she had the knife, he put her in a hold so that she would drop it, but that's it." (*Id.* at 11:1–5.)

Deputy Collins believed Pizzo had now given conflicting statements about the knife and he was suspicious about her initial failure to disclose the "physical contact" between Dalton and O.D. (*Defs' Ex. C2 – Sealed* at 199:20–200:2.) He then asked to speak with Dalton. (*Defs' Ex. E2 - Sealed* at 11:6–7.)

9

A few minutes later, Dalton came out of the house and Deputy Collins asked if "you mind talking to me for a second?" to which Dalton replied, "[y]eah sure. What do you need?" (*Defs' Ex. E2 - Sealed* at 11:16–18.) Deputy Collins said he was "just trying to figure out what's going on" and Dalton immediately responded: "What's going on is I have a mentally challenged kid that I'm 150 percent tired of every time --." (*Id.* at 11:19–23.) Deputy Collins interrupted Dalton and asked to move the interview to the sidewalk, away from where O.D. was standing because "I have to write a report, and then she overhears your statement, I just don't want her to get conflicting statements." (*Id.* at 11:24–12:6.) Dalton responded "[y]ou're dealing - - you're dealing - - everything is going to be a conflicting statement" and said he had "15 or 16 different CPS cases on me right now" and "[e]very time, because she wants to tell you a story about three times it happened before, three times it happened before over here, so." (*Id.* at 12:7–17.)

Although Dalton was initially calm, he was clearly becoming upset. (*Defs' Ex. E1 – Sealed* at 0:10:04–0:10:23.) Deputy Collins attempted to focus Dalton on what happened earlier that day, and Dalton replied, "[s]o what happened today is she pulled a knife on [Pizzo] again" but then Dalton quickly changed topics and said he was "pissed off" at "you guys." (*Defs' Ex. E2 - Sealed* at 12:18–21.) The Deputy asked "[w]hy?" and Dalton grew more agitated and said, "[t]he people that are supposed to be doing their job. When she [sic] have a child that's 15 or 16 years old pulling a knife on someone - -" (*Id.* at 13:1–5; *Defs' Ex. E1 – Sealed* at 0:10:30–0:10:37.) The Deputy attempted to interject, asking Dalton to "[g]ive me a second here," but Dalton continued, "I'm extremely pissed off at what's going on" and then accused the Deputy of refusing to listen. (*See Defs' Ex. E2 - Sealed* at 13:9–19.) Dalton said that because the Deputy had never been "out here before," the Deputy needed "to listen to what I have to tell you," and if the Deputy did not "want to listen… then I have nothing to tell you." (*Id.* at 14:1–8.)

As the Deputy began saying, "I'm trying to explain to you're," Dalton said he was "fed up" and began walking back toward the house. (*Defs' Ex. E2 - Sealed* at 14:9–11.) Deputy Collins followed him and told Dalton he was being detained. (*Id.* at 18:14–19;

*Defs' Ex. E1 − Sealed* at 0:11:10–0:11:15.) He then grabbed Dalton's shoulder, placed his hands behind his back and handcuffed him. (*Defs' Ex. E1 − Sealed* at 0:11:15–0:11:31.) Dalton was upset but did not resist. (*Id.*)

After handcuffing Dalton, Deputy Collins escorted him to his patrol vehicle and frisked him. (*Defs' Ex. E1 − Sealed* at 0:11:31–0:12:23.) The Deputy then asked Dalton "[s]o what - - you don't want to talk to me and tell me what happened?" and Dalton responded, "[o]kay, look, she's told you what happened" and continued, "I detained my child and pushed her outside. If that's a problem…." (*Defs' Ex. E2 − Sealed* at 17:1–8.)

At that point the Deputy's focus shifted to Pizzo, who was approaching, and he told her to keep her distance because the Deputy was by himself. (*Defs' Ex. E2 − Sealed* at 17:9–16.) The Deputy then again asked Dalton, "do you want to tell me what happened today or not?" and Dalton responded, "I want you to get somebody who's been here before, and then as soon as you figure out what's going on with my mentally disabled daughter that's got a five-year-old mentality, okay, as soon as you figure that out, I expect your apology." (*Id.* at 18:17–23.) The Deputy then explained to Dalton that he was being detained because he was "trying to investigate whether or not there's a crime." (*Id.* at 18:24–19:1.) Dalton, who was very agitated said, "there's a crime because we called you about her call - - fucking pulling a knife on people." (*Id.* at 19:6–8; *Defs' Ex. E1 − Sealed* at 0:15:50–0:14:04.) Dalton asked if he was under arrest, and the Deputy initially said, "[n]o, you're being detained right now." (*Defs' Ex. E2 - Sealed* at 20:1–3.) Dalton reiterated that he did not feel like talking, at which point the Deputy said he was arresting him for "[c]hild abuse, 272" and called for another patrol vehicle to transport Dalton. (*Id.* at 20:4–12.)

While waiting for the other vehicle, Dalton asked if "you have somebody coming out that's been here before? Because that child cannot be left here." (*Defs' Ex. E2 − Sealed* at 22:9–11.) Pizzo also said, "I don't feel safe with her here. She's got to go too." (*Id.* at 22:12–13.) At some point Dalton repeated that O.D. almost stabbed Pizzo, "[d]id

you catch on to that part?" and the Deputy confirmed that "you guys reported that."  (*Id.* at 25:25–26:5.)

Deputy De Francisco arrived to transport Dalton to jail. (*Pls' Ex.* at MSJ 063 (30:24–31:1), MSJ 065 (38:24–39:4).[2]) Deputy De Francisco had previously been called to the residence "[a]nywhere from seven to ten times." (*Id.* at MSJ 059 (16:21–17:2).) Those calls generally involved O.D. in "some type of argument" with Pizzo, and some involved O.D. threatening Pizzo with physical harm or with "some type of knife or stabbing type of instrument." (*Id.* at MSJ 059–060 (17:6–9, 17:22–18:16.) Deputy De Francisco testified that O.D. was generally calm when she arrived on scene, though a PERT clinician was sometimes summoned and some of the calls resulted in O.D. being placed on a medical hold. (*Id.* at MSJ 059–060 (17:3–5, 18:17–24.) This was consistent with Pizzo's previous statement to Deputy Collins that "once you guys find [O.D] she should be really nice and calm and cooperative for you guys. She usually is." (*Defs' Ex. D2 – Sealed* at 9:19–12:1.) Deputy De Francisco also testified that she knew of other deputies who had similar experiences at Plaintiffs' residence, which they referred to as a "chronic house." (*Pls' Ex.* at MSJ 060–061 (21:20–22:5, 23:12–16).[3]) Unfortunately, Deputy Collins did not ask, and Deputy De Francisco did not tell him about her previous experiences at Plaintiffs' residence.[4] (*Id.* at MSJ 064 (35:5–36:5).)

---

[2] Plaintiffs emailed their exhibits to the Court's e-file inbox but failed to file them on the docket. *See* CivLR 7.1f3.

[3] "Chronic house" refers to the fact that "it generates calls for service." (*Pls' Ex* at MSJ 061 (23:17–23).)

[4] During his deposition, Deputy Collins testified that he knew deputies had been to Plaintiffs' residence. (*Pls' Exhibits* at MSJ 026–027 (99:24–102:21).) However, the Deputy's testimony about whether he asked Deputy De Francisco about her previous experiences at the residence is confusing. He appears to have assumed she would have relayed relevant information without him having to ask. (*Id.* at (101:10–102:21).) Regardless, because a factual dispute exists about whether Deputy Collins asked Deputy De Francisco about her prior experiences, the issue is resolved against Defendants, as the moving party.

1   After Dalton was transported to jail, his bond was set at $100,000. (*Am. Compl.* ¶

2   19.) Dalton retained a bail bondsman, who charged $10,000 to secure Dalton's release.

3   (*Id.*) No criminal charges were filed. (*Id.* ¶ 20.)

4

5   **C.**   **Deputy Collins returns to Plaintiffs' home after a second report that**

6           **O.D. is being violent.**

7   Approximately two hours later, the telehealth provider called 911 to report that

8   O.D. was making threats to herself and others. (*Defs' Ex. G2 – Sealed* [Doc. 28] at 1.)

9   The assistant reported that Pizzo stated O.D. was acting aggressive toward her.  (*Id.*)

10  Deputy Collins responded to the call and found Pizzo and O.D. talking in the

11  garage. (*Defs' Ex. J1 – Sealed* [Doc. 28].[5]) The Deputy approached and said, "Hello.

12  What's going on now?" (*Defs' Ex. J2 -Sealed* [Doc. 28] at 2:1.) Pizzo, who was upset,

13  said "she dug her nails into me" and claimed to have a video. (*Id.* at 2:2–21.) The Deputy

14  responded, "[o]kay. Give me one second so I can figure out what's going on." (*Id.*)

15  After a few minutes, Deputy Collins moved Pizzo away from the garage and asked

16  "[w]hat's going on now?" (*Defs' Ex. J2 – Sealed* at 4:14.) Pizzo responded, "I just told

17  you. She got mad at me, she dug her nails into me. And then she was sitting on the couch,

18  we were all talking. She was telling us to - -." (*Id.* at 4:15–18.) At that moment Pizzo

19  received a call from Dalton in jail. (*Defs. Ex. J1 – Sealed* at 0:01:49–0:01:53.) While

20  Pizzo was on the phone, Deputy Collins said to Pizzo, "[c]an you do me a favor and talk

21  to me, please," but Pizzo said it was "Steven." (*Defs' Ex. J2 – Sealed* at 4:21–23.) The

22  Deputy asked "[o]kay. Do you want to talk to me or no?" and Pizzo said "no, you can just

23  - - you can wait" and then asked her younger daughter to "come here and get the phone

24  and talk to - -" (*Id.* at 4:24–5:4.) Deputy Collins responded, "[n]o, that's not - - that's not

25  how [this] works. Do you want to talk to me or no?" and Pizzo responded, "[y]eah, I do,

26  _____

27

28  [5] Defendants' Ex. J1 is video from Deputy Collins' body camera. The video also shows a woman, identified as Pizzo's mother, sitting in a car in the driveway, who leaves soon after the Deputy arrived.

1   but you know what, my boyfriend's calling me collect because you took him earlier." (*Id.*
2   at 5:5–9.)

3          Eventually Pizzo told the Deputy that she wanted him to take O.D. (*Defs' Ex. J2 –*
4   *Sealed* at 5:15.) She explained that after he left, O.D. dug her nails into Pizzo and began
5   telling "all of us" to shut up.  (*Id.* at 6:2–11.) O.D. then began throwing things, went
6   outside, got a stick and was "whacking" Pizzo, who took the stick away. (*Id.* at 6:13–23;
7   *Am. Compl.* ¶ 17.) Pizzo said, "she scratched my arm here and she swung at her brother
8   with the stick too…." (*Id.*) Pizzo then contacted telehealth support. (*Id.*)

9          Deputy Collins looked at the video that O.D.'s sister took of the altercation. (*See*
10  *Defs' Ex. J1 – Sealed* at 0:03:54–0:04:29; *Defs' Ex. J2 – Sealed* at 7:24–8:1.) The video
11  showed Pizzo repeatedly telling O.D. to "get your hands off me" and "let go of me."
12  (*Defs' Ex. I – Sealed* [Doc. 28] at 0:00:01–0:00:12.[6]) O.D. eventually let go of Pizzo,
13  demanded that Pizzo give her back the stick and when Pizzo refused, O.D. motioned as if
14  she was going to slap Pizzo's face. (*Id.* at 0:00:13–0:00:20.) O.D. then pinched Pizzo's
15  arm and raised a fist as if she was going to punch Pizzo in the face. (*Id.* at 0:00:21–
16  0:00:25.) O.D. then slapped and scratched Pizzo on the arm. (*Id.* at 0:00:25–0:00:27.)
17  O.D. eventually turned, walked into the kitchen and grabbed a knife. (*Id.* at 0:00:27–
18  0:00:40.) Pizzo followed O.D. and took the knife from O.D. (*Id.* at 0:00:40–0:00:57.)
19  Eventually, O.D. walked into the garage and Pizzo followed her. (*Id.* at 0:02:08–0:02:20.)
20         After looking at the video, the Deputy questioned O.D.'s sister, who confirmed
21  Pizzo's statement. (*Defs' Ex. J1 – Sealed* at 0:04:53–0:06:00.) Deputy Collins then
22  handcuffed O.D. and told her that he was taking her to the hospital.  (*Id.* at 12:14–15.)
23  //
24  //
25  //
26
27  _____
28  [6] Defendants' Ex. I is the cell-phone video.

                                      14

### D.      Plaintiffs file this lawsuit.

On December 29, 2021, Plaintiffs filed this lawsuit against the County and Deputy Collins. The Amended Complaint asserts three claims for relief against the Deputy under 42 U.S.C. § 1983 for (1) unreasonable seizure (Dalton's arrest), (2) unreasonable seizure (Pizzo's detention) and (3) state-created danger.  Plaintiffs also assert three state-based claims against both Defendants for negligence, false arrest (as to Dalton) and Violation of California Civil Code § 52.1(b) (the "Bane Act").

Defendants now move for summary judgment. They contend Deputy Collins is entitled to qualified immunity for the section 1983 claims. Defendants also seek summary adjudication of all of the state claims and the request for punitive damages.

## III.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV. DISCUSSION

### A. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public

16

1    officials accountable when they exercise power irresponsibly and the need to shield
2    officials from harassment, distraction, and liability when they perform their duties
3    reasonably." *Id.* A public official is entitled to qualified immunity "unless the official's
4    conduct violated a clearly established constitutional right. [Citation omitted.]" *Id.* at 232.

5    In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step
6    approach to evaluating qualified immunity. First, a court must decide if the facts make
7    out a violation of a constitutional right. *Id.* at 201. If so, the second step is whether the
8    right at issue was "clearly established" at the time of the official's alleged misconduct.
9    *Id.*[7] Whether the governing law was clearly established and whether specific facts
10   constitute a violation of established law are legal determinations. *Mabe v. San*
11   *Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001).

12   The Court will evaluate Plaintiffs' three 1983 claims separately.

13
14   **1.    Dalton's arrest.**
15   **a)    Was there a constitutional violation?**

16   Defendants argue Deputy Collins did not violate Dalton's constitutional rights
17   because there was probable cause to arrest him for child abuse under Penal Code §
18   273a(a) (a felony) or § 273a(b) (a misdemeanor). Plaintiffs disagree.

19   Probable cause to arrest is based on an objective standard. *U.S. v. Lopez*, 482 F.3d
20   1067, 1072 (9th Cir. 2007). It exists "when, under the totality of the circumstances known
21   to the arresting officers (or within the knowledge of the other officers at the scene), a
22   prudent person would believe the suspect had committed a crime." *Blankenhorn v. City of*
23   *Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (citing Du*bner v. City & Cnty. of San*
24   *Francisco*, 266 F.3d 959, 966 (9th Cir. 2001)). Probable cause "requires only a

25
26
_____

27   [7] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that while the mandatory
     two-step sequence set forth in *Saucier* "is often appropriate, it should no longer be regarded as
28   mandatory."

probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, —U.S.—, 138 S.Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). However, the information upon which probable cause is based must be reasonably trustworthy. *See Allen v. City of Portland*, 73 F.3d 232, 237 (9th Cir. 1995)) ("Probable cause exists when, at the time of arrest, the agents know reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.").

Because Deputy Collins' probable cause determination relied on information from O.D., *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979 (9th Cir. 2003), is helpful to the Court's analysis. In *Peng*, the defendant officer was dispatched to a family dispute over title documents relating to property. While at the scene, the victim, through a translator, told the officer that her brother forcibly took the documents from her. The officer then interviewed two other witnesses using the same translator, who told the officer that the witnesses saw the brother grab the documents against the victim's will. The officer arrested the brother for robbery, defined as "the felonious taking of personal property in the possession of another… accomplished by means of force or fear." *Id.* at 976.

Charges were not filed against the brother, who sued the officer under section 1983 for unlawful seizure. The officer moved to dismiss arguing that because there was probable cause to arrest plaintiff, there was no constitutional violation, and the officer was entitled to qualified immunity. The district court agreed and dismissed the case.

On appeal, plaintiff argued, among other things, that there was no probable cause because the officer relied solely on the victim's allegations. *Id.* at 973. In rejecting the argument, the Ninth Circuit cited the officer's interview of the two witnesses, who the translator represented confirmed the victim's statement. *Id.* at 978–979. The court then concluded:

> We are satisfied that [the officer] made a reasonable investigation under the circumstances before he arrested [plaintiff]. [Citation omitted.] We conclude that the presence of a factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if:

18

1    1) the victim's statements are sufficiently definite to establish that a crime
2    has been committed; and 2) the victim's complaint is corroborated by either
     the surrounding circumstances or other witnesses.

3  *Id.* at 979. [8]

4      Here, Dalton was arrested for child abuse under Penal Code § 273a. Violation of

5  subsection (a) of the statute is a felony and requires willful conduct committed "under

6  circumstances or conditions likely to produce great bodily harm or death."  *Diaz-*

7  *Rodriguez v. Garland*, 55 F.4th 697, 709 (9th Cir. 2022) (citations omitted).  If the acts

8  committed are "under circumstances or conditions other than those likely to produce

9  great bodily harm or death," it is a misdemeanor under § 273a(b).  *People v. Jaramillo*,

10  98 Cal.App.3d 830, 835 (1979). Accordingly, under *Peng*, to establish that Deputy

11  Collins had probable cause to arrest Dalton, Defendants must establish that the Deputy

12  conducted a reasonable investigation under the circumstances. Additionally, because he

13  relied on O.D.'s disputed statement, Defendants must identify reasonably trustworthy

14  information that corroborates O.D.'s allegations that Dalton choked, pushed her to the

15  ground and slapped her across the face.

16      In support of the argument that there was probable cause, Defendants contend that

17  O.D. was credible because she was articulate, spoke with sadness and fright in her voice,

18  and there was no indication she was experiencing a mental-health crises. (*Defs' P&A*

19  11:26–12:8, 12:28–13:1) Defendants also claim O.D.'s allegations were corroborated by

20  several facts. (*Id.* at 11:26–12:21.) For the reasons that follow, the Court is not persuaded.

21  //

22  //

23  //

24

25

26

27  [8] In the lawsuit, the plaintiff filed a declaration challenging the veracity of the translator. *Id.* at 979.
    However, because (1) there was no dispute the translator told the officer the two witnesses confirmed
28  the victim's story, and (2) the officer "could not have known" the translator may have been lying, the
    court concluded the officer acted reasonably. *Id.*

### (1) There is a disputed issue of fact regarding whether O.D. appeared to be experiencing a mental-health crises and was credible.

In order to evaluate Defendants' contention that there was no indication O.D. was having a mental-health crises and that she appeared credible, it is important to place her interview in the proper context. This is also consistent with the Supreme Court's statement that evaluating probable cause requires the court to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 138 S.Ct. at 586 (citation and internal quotation marks omitted).

There is no dispute that Deputy Collins was dispatched to Plaintiffs' residence because O.D. had pulled a knife on her parents and run away.  (*Defs' Ex. A2* at 1.) The Deputy knew the family had telehealth support and he was informed that O.D. had a history of depression and hurting her siblings and herself. (*Id.* at 1–4.) At some point, he learned O.D. had recently returned from a medical hold, ran away the previous evening and all week refused to take her medication. (*Defs' Ex. D2 – Sealed* at 2:16–21.) Pizzo also told the Deputy that in addition to grabbing the knife, O.D. got upset when she was not allowed to use her tablet, that she took Pizzo's phone and had been throwing things. (*Id.* at 3:5–4:18.) Pizzo showed the Deputy a bruise on her arm from O.D. and claimed to have O.D.'s nail marks on her shoulder. (*Id.* at 5:19–22.) Pizzo also informed the Deputy that when O.D. left the house, she wrapped an electrical cord around her neck. (*Id.* at 6:12–23.) These facts are inconsistent with Defendants' claim that there was *no indication* O.D. was experiencing a mental-health crises.

There is also no dispute that before arresting Dalton, the Deputy obtained information corroborating several of Pizzo's statements about O.D.'s behavior that morning. O.D. had clearly run away and, while being interviewed by the Deputy, O.D. admitted she got upset when Pizzo took her iPad, that she grabbed the knife from the sink and was yelling. O.D.'s younger sister confirmed O.D. took Pizzo's phone and that she heard Pizzo yelling at O.D. to take her nails out of her arm. The bruise on Pizzo's arm

20

confirmed O.D. had been violent. And Dalton also confirmed O.D. had pulled a knife on Pizzo and was yelling. This information further contradicts Defendants' contention.

Next, the Deputy's body-camera video is important in assessing O.D.'s mental state and Defendants' contention that she was credible because she appeared sad and frightful. The video confirms that while describing Dalton's alleged abuse, O.D. appeared sad and her voice quivered. However, the video also appears to show that O.D. quickly regained her composure and her responses to the Deputy's follow-up questions were generally unemotional and matter of fact, with no indication of sadness or fright. Moreover, aside from a few relatively short periods of sadness, the video reveals that for most of the interview (before and after describing the alleged abuse), O.D. was calm, affable and at times joked with the Deputy and laughed. Also relevant, O.D. appeared to become defensive when her younger sister began to tell the Deputy that she saw O.D. take Pizzo's phone and heard Pizzo yelling at O.D. to take your nails out of my arm.

In addition to O.D.'s labile demeanor, there is no dispute that some of her responses to the Deputy's questions were inconsistent. Most significantly, O.D.'s explanation of why she ran away changed after being warned by the Deputy. Initially, O.D. twice stated that she simply went for a walk because her parents told her to. Immediately after the Deputy warned O.D. that she would be taken back to the hospital and placed on a hold if she ran away again, O.D. alleged she left because Dalton abused her. Another example is O.D.'s denial that she dug her nails into Pizzo's arm, which was not only contradicted by Pizzo's statement, but by the younger sister's statement that she heard Pizzo yelling at O.D. to take your nails out of my arm.

In summary, Defendants' probable-cause argument relies, in part, on the contention that O.D. appeared credible because she was sad and frightful. The video, however, establishes O.D.'s demeanor was labile, often changing in an instant or in immediate response to a question. It further confirms that for most of the interview, O.D. was calm and affable, and at times joked with the Deputy and laughed. Additionally, there is no dispute there were inconsistencies with O.D.'s statements.

21

1    Unfortunately, neither party has provided expert testimony regarding whether,

2    under the circumstances, O.D.'s conduct suggested she was experiencing a mental-health

3    crises or if it was consistent with a minor who had just experienced physical abuse. In the

4    absence of such guidance, the Court finds a jury could reasonably conclude that O.D.

5    appeared to be experiencing a mental-health crises and did not appear credible.

6

7        **(2)    *Defendants have not identified reasonably trustworthy information***

8              ***corroborating O.D.'s allegations.***

9    Defendants also argue O.D.'s allegations were corroborated by the following

10   information:

11        1.    The Deputy noticed "redness" on O.D.'s face and "darkness" on her neck.

12        2.    Dalton was previously arrested for child endangerment.

13        3.    Dalton has told O.D. in the past that he is not afraid to go back to jail.

14        4.    Dalton "hurts" O.D. when he is angry, and on a previous occasion yanked

15              her hair and dragged her outside.

16        5.    Dalton is uncooperative and argues with law enforcement.

17        6.    Statements by Dalton and Pizzo corroborated portions of O.D.'s account.

18   (*Defs' P&A.* at 11:26–12:21; *Defs' Ex. C1* at 87:3–15.) Under the circumstances, the

19   Court finds these facts fail to sufficiently corroborate O.D.'s allegations of abuse.

20        The "redness" on O.D.'s face and "darkness" on her neck did not corroborate her

21   allegations for two reasons. First, Deputy Collins' conceded during his deposition that the

22   marks on her neck were not consistent with being choked, and he was not sure the

23   redness on her face was the result of being slapped. (*Defs' Ex. C1 - Sealed* at 50:11–12,

24   52:9–14, 116:3–6; *Defs' Ex. C2 - Sealed* at 152:13–23.) Moreover, the Deputy's body

25   camera footage reveals the redness on O.D.'s face was not limited to the side Dalton

26   allegedly slapped, repeatedly. Instead, O.D's overall complexion was slightly red,

27   consistent with being out in the sun, not with being slapped. (*Defs' Ex. E1 – Sealed* at

28   0:00:40–0:03:30.) And the dark marks at the top and bottom portions of O.D.'s neck were

not consistent with the way in which she claims Dalton chocked her—i.e., by placing her in a chokehold—and instead appear more consistent with Pizzo's statement that O.D. wrapped an electrical cord around her neck as she left the house. (*Defs' Ex. D2 – Sealed* at 6:20–23.) Also notable is the lack of any abrasions on O.D.'s body or clothes consistent with being pushed to the ground and then slapped.

Defendants' contention that Dalton's arrest record supported probable cause also lacks merit. During his deposition, Deputy Collins stated that Dalton's criminal history was relevant to the issue of officer safety and explained he did not "use it towards determining details and the facts of the arrest. I look up if the guy is known to be armed, charges for assaulting an officer." (*Defs' Ex. C2 – Sealed* at 169:5–10.) Additionally, there is no dispute the arrest was from 2006. The arrest record does not constitute reasonably trustworthy information that Dalton abused O.D. 15 years later.

Next, O.D.'s claims that Dalton (1) previously abused her and (2) says he is not afraid of returning to jail are also unavailing. Defendants have cited nothing suggesting either of the two claims is true. Thus, at best, both claims constitute unsubstantiated allegations and are not reasonably trustworthy information that Dalton abused her.

Defendants also contend O.D.'s statements that (1) Dalton was uncooperative and (2) Dalton argues with law enforcement support her credibility because Dalton was, in fact, uncooperative and argued with Deputy Collins. (*Defs' P&A* at 1213–15.) As an initial matter, it is important to point out that Dalton initially appeared cooperative. And although he quickly became agitated, the transcript and body-camera video indicate it was due to his perception that the Deputy was interrupting Dalton's statements despite the fact the Deputy had never been dispatched to the residence before. Regardless, assuming Dalton's lack of cooperation bolstered O.D.'s credibility, for the reasons discussed above, there remains sufficient evidence from which a reasonable jury could ultimately find O.D. was not credible regarding the child-abuse allegations.

Finally, Defendants contend statements by Pizzo and Dalton corroborated "portions of O.D.'s detailed account of the abuse." (*Defs' P&A* at 11:27–28.) Regarding

23

Pizzo, Defendants cite her statement that Dalton tried "to corral [O.D.] to go out front, that's it." (*Defs' Ex. E2 – Sealed* at 11:1–3.) Defendants also cite Dalton's statement that (1) he "detained [O.D.] and pushed her outside" and (2) he had "15 or 16 CPS cases on me." (*Id.* at 12:12–14, 17:7–8.) Defendants' reliance on these statements is unavailing for several reasons.

To begin, unlike the witnesses in *Peng*, none of Pizzo's or Dalton's statements corroborated any of the conduct constituting child abuse under Penal Code § 273a. At best, Dalton admitted detaining O.D. and pushing her outside, neither of which amount to child abuse, particularly given that O.D. had pulled a knife on Pizzo, was acting combative by grabbing Pizzo's phone, digging her nails into Pizzo's arm and yelling. The same is true with respect to Pizzo's statement that Dalton placed O.D. in a "hold" and corralled her.  In short, none of Pizzo's or Dalton's statements provide the type of corroboration given by the two witnesses in *Peng*, who confirmed that plaintiff had robbed the victim. *Peng*, 335 F.3d at 978–979

As for Dalton's statement regarding the 15 or 16 CPS cases, the Court agrees the statement was suspicious given O.D.'s allegations. However, under the circumstances, the comments were not sufficient to establish probable cause for two reasons. First, the reference to the CPS cases was vague to the extent it was unclear whether Dalton was claiming to be the subject of 15 or 16 CPS investigations, the timeframe of the cases, and the basis for the cases. Second, as explained above, there is no dispute that by the time Dalton made the statement, the Deputy had searched and found Dalton's only arrest record from 2006. Thus, the only inference that could be drawn is that the 15 or 16 CPS cases had not resulted in any criminal charges against Dalton. Given these undisputed facts, Dalton's statement that he had "15 or 16 CPS cases on me" were insufficient to corroborate O.D.'s allegations that she ran away because Dalton choked her, pushed her to the ground or slapped her.

In summary, there is no dispute that O.D.'s allegations of child abuse raised serious issues that warranted a thorough investigation by Deputy Collins. His

24

investigation was made even more difficult because Dalton quickly became agitated and failed to cooperate. Additionally, the lack of a mental-health expert likely placed the Deputy in a more difficult situation in assessing O.D.'s veracity and whether she was having a mental-health crises.

Nevertheless, none of the facts Deputy Collins was aware of at the time of the arrest corroborated O.D.'s allegations of abuse. While Dalton's comment regarding the 15 or 16 CPS cases was suspicious, under the circumstances they warranted further investigation. For all these reasons, the Court finds Defendants have failed to establish Dalton's constitutional rights were not violated.

### b)   Was the law clearly established?

The "clearly established" prong is a matter of law to be decided by a judge. *Reese v. County of Sacramento*, 888 F.3d 1080, 1037 (9th Cir. 2018). In evaluating whether a right is "clearly established," the "relevant, dispositive inquiry... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This is particularly true in the Fourth Amendment context, "where the Supreme Court has recognized that 'it is sometimes difficult for an

25

officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Reese*, 888 F.3d at 1038 (brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

The burden of establishing that the rights at issue were clearly established rests with the plaintiff. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("It is the plaintiff who bears the burden of showing that the rights allegedly violated were 'clearly established'.") (citation and internal quotation marks omitted).. Thus, Plaintiffs must "identify a case where an officer acting under similar circumstances as [Deputy Collins] was held to have violated the Fourth Amendment." *Id.* at 1117 (citing *White v. Pauly*, — U.S. —, 137 S.Ct. 548, 552 (2017) (per curiam)).

Here, Plaintiffs cite the following four cases in support of their argument that the law was clearly established: *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2000) (excessive force); *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019) (excessive force); *Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011) (excessive force); and *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2017) (excessive force and warrantless entry into a home). (*See Pls' Opp'n* at 24:1–4.) But none of these cases involved probable cause to arrest. Instead, all of the cases involved excessive-force claims.[9] Plaintiffs have, therefore, failed to demonstrate the law was clearly established.

Aside from Plaintiffs' failure to demonstrate that the law was clearly established, this Court has not found a case sufficiently similar to the circumstances Deputy Collins faced when arresting Dalton. *Peng* was helpful to the probable cause analysis to the extent it involved a disputed factual statement by the victim at the scene of a domestic disturbance, and thus established the need for corroboration. But this case involves material distinctions. Specifically, unlike *Peng*, Deputy Collins was confronted with serious allegations of child abuse by a juvenile suffering from mood disorder and

---

[9] *Sheehan*, 673 F.3d 1211, also involved a warrantless entry into a home.

26

depression, who was not current on her medication, and had pulled a knife on her parents and run away. Additionally, the alleged perpetrator of the child abuse—Dalton—quickly became agitated and failed to cooperate with the Deputy's investigation. Because the Court has not found a case that would have provided notice to Deputy Collins that probable cause was lacking at the time of the arrest and additional investigation was necessary, Deputy Collins is entitled to qualified immunity.

### 2.   Pizzo's detention.

#### a)   Was there a constitutional violation?

Pizzo contends she was unlawfully detained by Deputy Collins. The undisputed facts do not support her claim.

"A person is seized by the police… when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007). An officer has restrained the liberty of the citizen if, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *U.S. v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). A Fourth Amendment seizure occurs when there is a "meaningful interference, however brief, with an individual's freedom of movement." *United States v. Jacobsen*, 466 U.S. 109, 114 n.5 (1984). If a consensual encounter has ripened into an investigatory detention, the officer must have "reasonable suspicion." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). The appropriate inquiry is whether the officer's conduct "in some way restrain[ed]" the person's liberty such that a reasonable person under the circumstances would not have felt free to disregard the order. *U.S. v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003).

Here, there is no dispute that Deputy Collins never told Pizzo she was detained. Instead, Plaintiffs argue Pizzo believed she was not free to leave because:

- The Deputy was aggravated when he returned to the residence the third time.
- The Deputy was upset when Pizzo answered Dalton's call from jail.
- The Deputy previously stated, "if I come back and I hear there's some kind of disturbance between the two of you, then someone is going to be going to jail as well."
- Pizzo perceived the Deputy was going for his handcuffs.

(*Pls' Opp'n* at 9:20–29.) The Court is not persuaded.

To begin, the evidence does not support Plaintiffs' contention that Deputy Collins reached for his handcuffs while talking to Pizzo. The Deputy's body camera footage does not show him reaching for his handcuffs. (*See Defs' Ex. J1 – Sealed* at 0:00:00–0:09:00.) Moreover, Defendants established that when the Deputy returned to the residence, he did not have his handcuffs and used another deputy's handcuffs when he took O.D. into custody. (*See Defs' Ex. K1 – Sealed* [Doc. 28].)

Because it is undisputed the Deputy never reached for his handcuffs, Pizzo's claim boils down to whether a reasonable person would have felt Deputy Collins was so upset or frustrated that he or she was not free to leave. Again, the body camera footage does not support such a theory. It establishes that the Deputy was calm and polite throughout his interaction. While he may have been frustrated when Pizzo answered Dalton's call in the middle of the interview, there was no indication she was not free to leave. This is confirmed by the transcript of Pizzo and the Deputy's interaction:

> DEPUTY COLLINS: What's going on now?
>
> TINA PIZZO: I just told you. She got mad at me, she dug her nails into me. And then she was sitting on the couch, we were all talking. She was telling us to --
>
> (Phone ringing.)
>
> TINA PIZZO: Hello.
>
> DEPUTY COLLINS: Can you do me a favor and talk to me, please.

1  TINA PIZZO: It's Steven.

2  DEPUTY COLLINS: Okay. Do you want to talk to me or no?

3  TINA PIZZO: Okay. So no, you can just - - you can wait.

4
5  Hey, you [signaling to Pizzo's younger daughter] come here and get the phone and talk to - -

6
7  DEPUTY COLLINS: No, that's not - - that's not how to works. Do you want to talk to me or no?

8
9  TINA PIZZO: Yeah, I do, but you know what, my boyfriend's calling me collect because you took him earlier.

10  DEPUTY COLLINS: Okay.

11  TINA PIZZO: Okay? Remember all that?

12  DEPUTY COLLINS: Do you want to talk to me now?

13
14  TINA PIZZO: Yes, I do.

15  DEPUTY COLLINS: Okay. What's going on?

16  TINA PIZZO: I want you to take [O.D.]

17  (*Defs' Ex. J2 — Sealed* at 4:19–5:15, brackets added; *Defs' Ex. J1 — Sealed* at 0:01:35–
18  0:02:29.) Nothing in this exchange suggests Pizzo was detained. To the contrary, the
19  Deputy asked her several times if she wanted to talk to him, suggesting she could refuse.

20  Based on the undisputed facts regarding the encounter between Pizzo and Deputy
21  Collins, nothing would have communicated to a reasonable person that Pizzo was
22  detained. *See U.S. v. Chan-Jimenez*, 125 F.3d at 1326. Accordingly, Deputy Collins is
23  entitled to qualified immunity regarding this claim.

24
25  **3.   State created danger theory.**

26  **a)   Constitutional violation.**

27  The "state-created danger" doctrine is an exception to the general rule "'that a state
28  is not liable for its omissions' and the Due Process Clause does not 'impose a duty on the

29

state to protect individuals from third parties.'" *See Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) and *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)). Under the exception, a state violates the Due Process Clause where its action "'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989) and quoting *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir.1989) (bracket asserted by *Kennedy*).

To state a claim under the state-created danger doctrine, a plaintiff must plead facts supporting three elements: (1) the officer's affirmative actions created or exposed plaintiff to an actual, particularized danger that she would not otherwise have faced; (2) the injury suffered was foreseeable; and (3) the officer was deliberately indifferent to the known danger. *Martinez*, 943 F.3d at 1271. "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel v. Kent School Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citing *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). The standard is "even higher than gross negligence—deliberate indifference requires a culpable mental state." *Id.* In the context of a state-created-danger claim, "deliberate indifference is a subjective standard that requires a plaintiff to allege facts supporting an inference that the official recognized an unreasonable risk and actually intended to expose the plaintiff to such risk.'" *Polanco v. Diaz*, 76 F.4th 918, 928 (9th Cir. 2023) (quoting *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160–61 (9th Cir. 2021)).

Here, Plaintiffs contend "Deputy COLLINS increased the danger to Ms. PIZZO by falsely arresting her husband and family protector despite a well-documented history of O.D.'s violent tendencies." (*Pls' Opp'n* at 16:19–23.) Defendants argue Pizzo cannot

prevail on this claim because there is no evidence Deputy Collins was deliberately indifferent.

Based on Plaintiffs' theory, to establish deliberate indifference, they must identify evidence that Deputy Collins recognized that Dalton was the "family protector" so that arresting him increased the danger to Pizzo. In their opposition, however, Plaintiffs focus on simply stating the elements of the state-created-danger doctrine. (*Pls' Opp'n* at 16:25–17:28.) There is no effort to identify evidence or undisputed facts from which a reasonable inference could be drawn that the Deputy recognized Dalton was the family protector and arresting him would expose Pizzo to a greater risk of danger. Instead, the opposition simply asserts:

> A sufficient showing of deliberate indifference has been made to allow the case to go to a jury. Deputy COLLINS "disregarded a known or obvious consequence of his actions," to wit, the continuance of an assault that led to a police response in the first place. The consequences of his actions were obvious: injury could have (and did) occurred [sic] to Ms. PIZZO, as his partner, Deputy De Francisco was well aware.

(*Id.* at 17:29–18:4.) Because Plaintiffs have failed to cite evidence supporting an element essential to Pizzo's claim, summary adjudication is required. *See Bryant v. Lowe's Home Centers, LLC*, 2023 WL 8797886, *1 (9th Cir. 2023) (affirming summary judgment where defendant argued plaintiff could not prove essential element of claim and plaintiff failed to produce evidence in response).

Moreover, notwithstanding Plaintiffs' failure to establish an essential element of the claim, the Court finds the undisputed facts do not give rise to an inference that Deputy Collins acted with deliberate indifference. As Defendants point out, the Deputy was aware that Pizzo was O.D.'s primary caregiver and alone left the house to find O.D. These facts suggest Pizzo did not feel threatened being alone with O.D. and did not need Dalton for protection. There is also no dispute Pizzo told the Deputy that when O.D. grabbed the knife, Pizzo quickly disarmed her without Dalton's help:

31

I was in the kitchen, I was making food, there was a knife right there.  She grabbed it.  She's all, you want me to stab you?  And I'm all, stop.  And so I go take the knife away.

(*Defs' Ex. D – Sealed* at 4:3–7.) Pizzo also stated that after hearing the yelling, Dalton came out of the bathroom and told O.D. to "go for a walk."  (*Id.* at 4:10–13.) O.D. then left. (*Id.* at 4:17–18.) Again, nothing from this description of events suggested Pizzo needed Dalton for protection.

The Court recognizes that when the Deputy returned to the residence, Pizzo said Dalton was "trying to corral [O.D.] to go out front" and "when she had the knife, he put her in a hold so that she would drop it…." (*Defs' Ex. E2 – Sealed* at 11:1–5.) But this statement was in response to the Deputy's follow-up about any physical altercation between O.D. and Dalton. (*Id.* at 10:23–11:1.) The statement was also at odds with Pizzo's initial statement about how she simply took the knife from O.D. Under these circumstances, Pizzo's statements are insufficient to establish that when Deputy Collins arrested Dalton, he knew Dalton was the family protector and intended to expose Pizzo to an increased risk of harm. *Polanco*, 76 F.4th at 928 (citation omitted). Thus, the Court will grant summary adjudication against Pizzo's state-created danger claim.

### B.   Negligence claim

Defendants seek summary adjudication against Plaintiffs' negligence claim. Defendants point out, however, that the "exact contours of Plaintiffs' negligence claim are undefined by the First Amended Complaint and the basis for Plaintiffs' allegation that Deputy Collins acted negligently are not clear." (*Defs' P&A* at 21:17–21.) Defendants nevertheless argue summary adjudication is warranted to the extent the claim is based on Deputy Collins' alleged inadequate investigation, false arrest of Dalton or increasing the risk of harm to Pizzo. (*Id.* at 22:17–23:21.)

As an initial matter, the Court agrees with Defendants that as pled in the Amended Complaint, Plaintiffs' negligence cause of action is extremely vague. Nevertheless, in the

opposition, Plaintiffs clarify that the claim is "not based on an inadequate investigation, but rather a false arrest and increased risk of harm." (*Pls' Opp'n* at 19:19–21.)

With respect to the negligence claim based on Dalton's false arrest, Defendants argue summary adjudication is warranted because there was "ample probable cause for the arrest." (*Defs' P&A* at 23:3–5.) For the reasons discussed above in section IV.A.1.a, Defendants' argument is unavailing and summary adjudication denied as to this claim.

Regarding the increased risk of harm theory, as set forth above in section IV.A.3.a, Plaintiffs have made no effort to establish that Deputy Collins increased the risk of danger to Pizzo. Additionally, the undisputed facts establish Pizzo did not need Dalton for protection. Thus, summary adjudication in favor of Defendants is appropriate as to this claim.[10]

### C.   Bane Act claim

The Bane Act was enacted in 1987 to address hate crimes and "civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'" *Reese v. County of Sacramento*, 888 F.3d 1030, 1039 (9th Cir. 2018) (quoting *Venegas v. County of Los Angeles*, 153 Cal.App.4th 1230, 63 Cal.Rptr.3d 741, 742 (2007)). To prevail on a Bane Act claim, "[a] plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 23 Cal.4th 41, 67 (2015).

Defendants seek summary adjudication of Plaintiffs' Bane Act claim on two grounds. First, they contend Deputy Collins did not violate Plaintiffs' constitutional rights. Because the Court has found Deputy Collins did not violate Pizzo's constitutional

---

[10] To the extent Plaintiffs intended to assert a negligence claim arising out of Pizzo's alleged detention, for the reasons stated in section IV.A.2.a, the claim lacks merit.

rights, summary adjudication is granted as to her Bane Act claim. Because the Court has rejected Defendants' argument that Deputy Collins did not violate Dalton's constitutional rights, this argument lacks merit as to Dalton's Bane Act claim.

Second, Defendants argue there is no evidence that Deputy Collins acted with the specific intent to violate Dalton's constitutional rights. (*Defs' P&A* at 24:12–25:10.) In support of this argument, Defendants contend that "[n]o evidence exists that Deputy Collins acted with an open defiance or in reckless disregard for Dalton's rights. Rather, Deputy Collins was genuinely attempting to investigate potential child abuse." (*Id.* at 24:23–25.)

Plaintiffs' opposition asserts that "Plaintiffs has [sic] brought forth enough evidence to allow a reasonable jury to find a reasonable inference that Deputy COLLINS acted in reckless disregard of Plaintiff's Fourth and Fourteenth Amendment rights as previously argued above." (*Pls' Opp'n* at 19:5–8.) However, once again, Plaintiffs fail to identify the evidence, leaving it to the Court to attempt to determine what facts support the claim. Because reckless disregard is an essential element of Dalton's Bane Act claim, this failure is fatal to that claim.

In addition, the evidence before the Court does not support an inference that Deputy Collins intended to violate Dalton's constitutional rights. Although there was no probable cause to arrest Dalton, there is no dispute that O.D. told the Deputy that Dalton abused her. There is also no dispute that Dalton made disparaging comments about O.D., asserted he had 15 or 16 CPS cases "on him" and that Pizzo gave two different descriptions of how O.D. was disarmed. Finally, there is also no dispute that Dalton became agitated and was uncooperative as the Deputy was attempting to investigate O.D.'s allegations. While the circumstances do not support probable cause to arrest, they also do not support an inference that Deputy Collins intended to violate Dalton's constitutional rights. Thus, summary adjudication of this claim is warranted.

//

//

### D.    **Punitive Damages.**

Defendants also seek summary adjudication of Plaintiffs' punitive damage claim. As set forth in their motion, punitive damages are only available where a defendant's conduct is motivated by evil motive or intent or involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Reckless or callous indifference has been described as a defendant engaging in conduct "in the face of a perceived risk that [his or her] actions will violate federal law...." *Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC*, 743 F. App'x 116, 118 (9th Cir. 2018).

Plaintiffs' opposition argues the following Ninth Circuit Pattern Jury Instruction applies to their request for punitive damages:

> You may award punitive damages only if you find that the defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights.
>
> Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff.
>
> Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law.
>
> An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of the plaintiff....

(*Pls' Opp'n* at 19:24–20:6.) Based on the above instruction, Plaintiffs' argue the following undisputed facts support an award of punitive damages: (1) Deputy Collins was aggravated at not being notified that O.D. had returned; (2) he was aggravated at being ignored by Dalton; (3) he told Pizzo she was "impossible to help"; and (4) the Deputy said if he returned and hears "there's some kind of disturbance, then someone is going to be going to jail as well." (*Id.* at 20:9–15.)  The argument lacks merit.

As an initial matter, because summary adjudication is appropriate as to all of Pizzo's causes of action, her request for punitive damages is moot. Thus, only Dalton's request for punitive damages is at issue.

With respect to Dalton's request for punitive damages, two of the facts Plaintiffs cite above—i.e., the Deputy's alleged comment to Pizzo that "she was impossible to help" and "someone is going to be going to jail"—occurred after Dalton was arrested and, therefore, are not relevant to whether Deputy Collins' conduct was oppressive, malicious or in reckless disregard of Dalton's rights. Accordingly, Plaintiffs' request for punitive damages is based entirely on the Deputy's alleged aggravation with (1) not being notified that O.D. returned home and (2) Dalton ignoring him.

As an initial matter, Plaintiffs have not cited and the Court is unaware of any case where punitive damages have been awarded because law enforcement appeared frustrated. Regardless, the Deputy's body camera video contradicts Plaintiffs' argument. It establishes that throughout the Deputy's interaction with Pizzo and Dalton, Deputy Collins was calm, polite, never used threatening language and was focused on attempting to investigate O.D.'s allegations. Even assuming for the sake of argument the Deputy was frustrated with Plaintiffs' failure to inform him that O.D. had returned and Dalton's failure to cooperate with his investigation, the Court finds it did not rise to the level of oppression, malice or reckless disregard for Dalton's constitutional rights. Thus, summary adjudication is required.

## V.   CONCLUSION & ORDER

For the following reasons, the Court **GRANTS** the motion to seal [Doc. 27], **GRANTS** the joint motion to authenticate documents [Doc. 40] and **GRANTS IN PART** and **DENIES IN PART** the summary-judgment motion [Doc. 29] as follows:

- Summary adjudication is granted in favor of Defendants as to all of Pizzo's claims for relief.

36

- Summary adjudication is granted in favor of Defendants as to Dalton's Section 1983 Claim, Bane Act Claim and request for punitive damages.

- Summary adjudication is denied as to Dalton's Negligence Claim based on his unreasonable seizure.

- Plaintiffs shall file a copy of their exhibits in support of the opposition (i.e., MSJ 001–MSJ 197) within one week of the date of this order.

**IT IS SO ORDERED**

Dated:  March 27, 2024

Hon. Thomas J. Whelan
United States District Judge